# EXHIBIT G

```
----------------------------------------------------X
IN THE MATTER OF THE ARBITRATION          :
                                          :
          -between–                       :
                                          :
MISHI POPOVICH, SANDRA AGUILERA,          :
BRENDAN CASEY, and JOHAN MESTANZA,        :
on behalf of themselves and all others similarly  :
situated,                                 :
                                          :
                    Claimants,            :
                                          :
          -and-                           :
                                          :
RAME, LLC d/b/a CAFÉ CENTRO, and          :
PATINA RESTAURANT GROUP, LLC,             :
                                          :
                    Respondents.          :
----------------------------------------------------X
```

BEFORE:     Bonnie Weinstock, Arbitrator


**CLAIMANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A THRESHOLD CLAUSE CONSTRUCTION AWARD IN SUPPORT OF COLLECTIVE AND CLASS ARBITRATION**


BERKE-WEISS & PECHMAN LLP
488 Madison Avenue, 11th Floor
New York, New York 10022
(212) 583-9500
*Attorneys for Claimants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

STATEMENT OF CASE AND FACTUAL BACKGROUND.................................................1

    A. The Dispute Resolution Agreement and Dispute Resolution Policy .................2

    B. Procedural History.................................................................................................4

ARGUMENT..........................................................................................................................5

POINT I

    THE ARBITRATION AGREEMENT PERMITS CLASS ARBITRATION................5

    A. The Broad Language of the Respondents' DRA/DR Policy Permits
       Class and Collective Actions in Arbitration................................................5

    B. No Language in the DRAs or DR Policies Limits Claimants to
       Bringing Claims Only on an Individual Basis ........................................10

    C. The Supreme Court Holding in *Stolt-Nielsen* Supports Permitting a
       Class and Collective Action in this Proceeding........................................11

POINT II

    PRINCIPLES OF CONTRACT INTERPRETATION SUPPORT
    PERMITTING CLASS ARBITRATION..................................................................16

    A. The Expectation of the Parties...........................................................................16

    B. The Reasonable Interpretation of the Contract................................................18

    C. Respondents' Contract of Adhesion Supports a Finding that
       Respondents Consented to Class Arbitration........................................19

    D. Policy Considerations Further Support a Finding that Respondents
       Consented to Class Arbitration................................................................20

    E. Contracts Should be Interpreted to be Lawful to the Extent Possible..............21

POINT III

    IF THERE WAS NO AGREEMENT REGARDING
    CLASS ARBITRATIONS, THEN THERE IS NO
    AGREEMENT TO ARBITRATE ...........................................................................23

POINT IV

    A CLASS ARBITRATION WAIVER WOULD
    BE UNENFORCEABLE...................................................................................24

    A. Lack of Adequate Notice..........................................................................25

    B. Respondent's DRAs and DR Policies Should be Interpreted to
       Accomplish Their Fundamental Purpose of Using Arbitration to
       Resolve All Disputes With Employees .................................................28

CONCLUSION ...............................................................................................29

## TABLE OF AUTHORITIES

## CASES

*52nd Street Hotel Assocs. D/B/A Novotel New York,*
  321 NLRB 624 (1996) .................................................................................22

*67 Wall Street Co. v. Franklin National Bank,*
  37 N.Y.2d 245 (1975) ................................................................................18

*Amchem Products, Inc. v. Windsor,*
  521 U.S. 591 (1997) ..................................................................................25

*AT&T Mobility LLC v. Concepcion,*
  No. 09-893 (Apr. 27, 2011) .......................................................................26

*Barrentine v. Arkansas-Best Freight Sys.,* 450 U.S. 728, 740 (U.S. 1981) ...................25

*Bazzle v. Green Tree Fin. Corp.,*
  569 S.E.2d 349 (S.C. 2002) ......................................................................20

*Bensen v. CSA-Credit Solutions of America,*
  11-160-M-02281-08 (Jul. 6, 2010).................................................................8

*Boosey & Hawkes Music Publishers v. Walt Disney Co.,*
  145 F.3d 481 (2d Cir. 1998) ......................................................................19

*Colquhoun v. Chemed Corp. and Roto-Rooter Services, Inc.*
  No. 11-160-001581-10 (AAA, May 6, 2011)...................................8, 14, 18, 21

*Demetriou v. Earthlink, Inc.,*
  No. 11-117-0027-10 (AAA, Sept. 1, 2010) .................................................15, 16

*DePianti v. Jan-Pro Franchising Int'l.,*
  Nos. 08CV10663, 111140083807, 2008 WL 6045831 (AAA, Oct.8, 2008)...................8

*Deposit Guar. Nat'l Bank v. Roper,*
  445 U.S. 326 (1980) ..................................................................................25

*Dickler v. Shearson Lehman Hutton,*
  596 A.2d 860 (Pa. Super. 1991) ...................................................................8

*Doctor's Assocs., Inc. v. Casarotto,*
  517 U.S. 681 (1996)...................................................................................24

*Galakhova v. Hooters of America, Inc.*
  34-2010-00073111-CU-OE-GDS (Cal., Sacramento Cty.
  Jul. 27, 2010) ..........................................................................................14

*Geiger v. Ryan's Family Steak Houses, Inc.*,
   134 F.Supp.2d 985 (S.D. Ind. 2001) ............................................................................27

*Gentry v. Superior Court*,
   42 Cal. 4th 443 (2007) ...........................................................................................18, 26

*Gilmer v. Interstate/Johnson Lane Corp.*,
   500 U.S. 20 (1991)...........................................................................................................25

*Hopkins v. New Day Financial*,
   643 F.Supp.2d 704 (E.D. Pa. 2009) ............................................................................26

*Howell v. Smith*,
   128 S.E.2d 144 (N.C. 1962)............................................................................................9

*In re 127 Restaurant Corp. D/B/A/ Le Madri Restaurant*,
   331 NLRB 269 (2000) ...................................................................................................22

*Jock v. Sterling Jewelers Inc.*,
   646 F.3d 113 (2d Cir. N.Y. 2011) ...............................................................................13

*John's Insulation Inc. v. Siska Construction Co., Inc.*,
   671 F.Supp. 289 (S.D.N.Y. 1987) ..................................................................................9

*JSC Surgutneftegaz v. Pres. & Fellows of Harvard College*,
   No. 04 Civ. 6069(RMB), 2007 WL 3019234 (S.D.N.Y. Oct. 11, 2007)...........................7

*Kristian v. Comcast Corp.*,
   446 F.3d 25 (1st Cir. 2006)....................................................................................24, 28

*Labor Ready Northwest, Inc. v. Crawford*, Civil No. 07-1060-HA,
   2008 WL 1840749 (D.Or. April 21, 2008) .....................................................................7

*Liodori v. CIGNA Corp.*,
   175 N.J. 76 (2002) .........................................................................................................26

*Miller v. Hekimian Labs., Inc.*,
   257 F. Supp. 2d 506 (N.D.N.Y. 2003) ...........................................................................9

*Morrison v. Circuit City Stores, Inc.*,
   317 F.3d 646 (6th Cir. 2003) ........................................................................................26

*Nat'l Supermarkets Assoc. v. Am. Express Travel Related Servs. Co. (In re Am. Express Merchants' Litig.)*,
   634 F.3d 187 (2d Cir. 2011) .........................................................................................25

*Passow v. The Smith & Wollensky Restaurant Group, Inc.*,
   No. 11-160-00357-08 (Jan. 5, 2011)............................................................................10

*Quiles v. Financial Exchange Co.,*
    879 A.2d 281(Pa. Super. 2005) ......................................................26

*Ramirez v. Cintas,*
    No. C 04-00281 JSW, 2009 WL 921629 (N.D. Cal. Apr. 3, 2009)................................8

*Rowe v. Great Atlantic & Pacific Tea Co., Inc.,*
    46 N.Y.2d 62 (1978) ......................................................16

*Saigon Gourmet,*
    353 NLRB No. 110 (2009) ......................................................22

*Saincome v. Truly Nolen of Am., Inc.,*
    2011 U.S. Dist. LEXIS 85880 (S.D. Cal. Aug. 3, 2011) ......................................................20

*Shahriar v. Smith & Wollensky Restaurant Group Inc.,*
    Case No. 10-1884-cv (2d Cir. 2011) ......................................................9

*Shirchack v. Dynamics Research,*
    508 F.3d 49 (1st Cir. 2007)......................................................26, 27

*Slatt v. Slatt,*
    102 A.D.2d 475 (N.Y. App. Div. 1984)......................................................19

*The Smith & Wollensky Restaurant Group, Inc. v. Passow,*
    Civ. No. 10-11498-EFH, Doc. No. 17 (D. Mass. Jan. 18, 2011) ......................6, 7, 13, 18

*Stolt-Nielsen v. AnimalFeeds International Corp.,*
    130 S.Ct. 1758 (2010)...................................................... *passim*

*Trinity Trucking & Materials Corp.,*
    221 NLRB 364 (1975) *enfd. mem.* 567 F.2d 391 (7th Cir. 1977)
    *cert. denied* 438 U.S. 914 (1978) ......................................................22

*Tudesco v. Wilson,*
    60 A.2d 388 (Pa. 1948) ......................................................10

*U-Haul Co. of Ca., Inc.,*
    347 NLRB 375 (2006) *enfd.* 255 Fed. Appx. 527 (D.C. Cir. 2007) ......................................................22

*U.S. v. Stuart,*
    489 U.S. 353 (1989) ......................................................19

*Wells Fargo Bank, N.A. v. ESM Fund I, LP 67,*
    785 F. Supp. 2d 188 (S.D.N.Y. 2011)......................................................9

## STATUTES

12 N.Y.C.R.R. § 142-2.4 ..........................................................................................2

29 U.S.C. § 157 .....................................................................................................22

29 U.S.C. § 158 .....................................................................................................22

29 U.S.C. § 216(b) ................................................................................................21

29 U.S.C. § 201, et seq. ..........................................................................................4

29 U.S.C. § 202 .....................................................................................................21

N.Y.C.P.L.R. 9 (McKinney 2006) .........................................................................21

N.Y. Lab. L. § 190, et seq. .......................................................................................4

## OTHER AUTHORITIES

Restatement (Second) of Contracts (1981) ....................................................... *passim*

11 *Williston On Contracts* (4th Ed.). ............................................................... *passim*

29 U.S.C. § 2 ........................................................................................................24

2011 AAA Employment LEXIS 161 .....................................................................15

## STATEMENT OF CASE AND FACTUAL BACKGROUND

Rame, Inc. and Patina Restaurant Group, LLC (collectively "Respondents" or "Café Centro") jointly own Café Centro, a restaurant located at 200 Park Avenue, New York, New York, 10017. Respondents improperly calculated their waitstaffs' overtime hours, and denied them overtime and "spread of hours" pay, gratuities, and healthcare benefits to which they were entitled under the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL").

Claimants in this case are Café Centro's former waitstaff.[1] Claimants frequently worked two distinct shifts; shifts during normal business hours ("Regular Hours") and shifts for banquet events and private parties ("Banquet Hours"). Claimants were compensated differently based on what type of shift they worked and, consequently, Regular Hours and Banquet Hours were tallied separately on Claimants' paychecks. Respondents failed to aggregate these two categories of hours for the purposes of calculating total daily and weekly hours that Claimants worked and the resulting "spread of hours" and overtime pay owed to them. In or about 2008, Café Centro began a breakfast work shift. Hours worked during breakfast shifts, similar to those worked during banquet shifts, were tallied separately from all other hours. Again, Respondents failed to aggregate these hours with other categories of hours for the purposes of calculating hours worked and the resulting "spread of hours" and overtime pay.

---

[1] Popovich worked as a waiter from on or about September 2004 to April 2010. Aguilera worked as a waitress from on or about June 2008 to February 2010; Casey worked as a waiter and a bartender from on or about March 2003 to June 2010; Mestanza worked as a food runner, busboy, and bartender from on or about 1995 to 1997, and from on or about 2001 to December 2008; Hewetson worked as a waiter for Café Centro from approximately, July 2008 to May 2010, and Cuevas worked as a waiter for Café Centro from

Due to these miscalculations of overtime, Respondents underpaid Claimants the overtime they earned and at some times denied them enrollment for healthcare benefits to which they were entitled.  Additionally, Café Centro failed to pay Claimants "spread of hours" wages.  Under New York Labor Law, 12 NYCRR § 142-2.4, on each day in which the time between an employee's start time and end time exceeds ten hours, an employee is entitled to receive one hour's pay at the basic minimum hourly wage rate (before allowances), in addition to the minimum wages otherwise required.

Finally, Respondents failed to pay gratuities that were intended for Café Centro's waitstaff.  Claimants frequently worked banquets and private parties where they received no gratuities and were instead paid a flat, per-hour rate of $23.00.  Respondents would nonetheless negotiate a "service charge" for these events (regularly twenty percent of the total bill), to be paid in advance by the customer.  These service charges were gratuities that should have been distributed to the Claimants, but they were not.

The methodology by which Respondents denied Claimants their lawful compensation under the FLSA and NYLL was the same exact methodology that they used to deprive Claimants' 100+ co-workers of their lawful compensation.

## A.     The Dispute Resolution Agreement and Dispute Resolution Policy

Upon hire in 2007, Aguilera, Hewetson, and Cuevas each signed Dispute Resolution Agreements ("DRAs").  *See* Respondents' Memorandum, Exhibits C-E.  Claimants Casey, Mestanza, and Popovich, who were all hired before 2007, signed various documents upon hire.  However at no time did these Claimants sign a DRA.  The DRA states in relevant part:

> By accepting or continuing employment with the Company, you agree and understand that both you and the Company mutually agree to resolve and [sic] binding arbitration any

> claim that, in the absence of this Agreement, would be resolved in a court of law under applicable state or federal law. The claims governed by this agreement are those that you or the Company may have relating to your employment with, behavior during or termination from, the Company. Claims for workers' compensation or unemployment compensation benefits are not subject to this agreement.
>
> By accepting or continuing employment with the Company, you and the Company both agree to resolve such claims through final and binding arbitration. This includes, but is not limited to, claims of employment discrimination because of race, sex, religion, national origin, color, age, disability, medical condition, martial status, gender identity, sexual preference or any other characteristic protected by applicable law. It also includes any claim you might have for unlawful harassment including sexual harassment and unlawful retaliation; any claims under contract or tort law; any claim for wages, compensation or benefits; and any claim for trade secret violations, unlawful competition or breach of fiduciary duty.

Respondents' Memorandum, Exhibit C. *See also* Exhibit D for a similar DRA.

Some time on or after April 2007, at a mandatory staff meeting, Café Centro provided its then-current waitstaff, including Claimant Popovich, with a new version of the Hourly Team Member Handbook. *See* Popovich Decl. at ¶ 12 ; *see also* Patina Restaurant Group Hourly Team Member Handbook, attached hereto as Claimants' Exhibit A.

The Handbook contains a Dispute Resolution Policy ("DR Policy"). The policy states in relevant part:

> By accepting or continuing your employment with the Company, you will be agreeing that both you and the Company will resolve by mediation and final and binding arbitration any claim that would otherwise be resolved in a court of law. The claims governed by this agreement are those that you or the Company may have relating to your employment with, behavior during, or termination from the Company. Claims for workers' compensation or unemployment compensation benefits are not subject to this agreement.

***

> Please note that minor team members (under the age of 18)
> are required to have a parent or legal guardian sign the
> dispute resolution agreement.

*Id.*

## B.   Procedural History

Named Claimants, former employees of Café Centro, collectively commenced an

action in the Southern District of New York by filing a Complaint on January 3, 2011.

The action was brought to recover unpaid overtime, spread-of-hours pay, and other

monies pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and

the New York Labor Law ("NYLL") § 190, *et seq.*, on behalf of waitstaff who worked at

Café Centro.  The action also sought to recover misappropriated "service charges" that

Café Centro led its customers to believe were gratuities to be paid in their entirety to

their service staff, but which were actually "skimmed" by the house.  Plaintiffs sought

injunctive and declaratory relief, compensation for unpaid overtime wages, spread-of-

hours pay, misappropriated service charges, liquidated damages, interest, and

attorneys' fees and costs pursuant to the FLSA and the NYLL.

On May 20, 2011, Respondents filed a motion to dismiss and to compel

arbitration, alleging that all Claimants were subject to Respondents' DRAs and/or their

DR Policies.  On July 2, 2011, Claimants voluntarily dismissed, without prejudice, their

federal court Complaint.  On September 23, 2011, the parties entered into a joint

stipulation whereby the parties agreed to proceed pursuant to the terms of the DRA and

DR Policies.  The parties further stipulated, *inter alia,* that the arbitration proceeding

would be governed by AAA Employment Arbitration Rules and any related

supplementary rules.  The parties agreed to obtain a threshold clause construction

award from the Arbitrator regarding collective/class arbitration and each party set

4

forth its version of the Threshold Issue.  Respondents defined the issue as "[m]ay Claimants attempt to pursue a claim or claims in arbitration on behalf of others on a class-wide and/or collective basis where, as here, the DRA does not specifically refer to the terms 'class' or 'collective' arbitration and is otherwise silent on the issue of 'class' or 'collective arbitration.'"  Claimants defined the issue more broadly and simply stated "[m]ay the arbitration proceed on a collective and/or class action basis?"  Claimants hereby set forth their  Memorandum of Law in Support of their Motion for a Threshold Clause Construction Award in Support of Collective and Class Arbitration.

**ARGUMENT**

**POINT I**

**THE ARBITRATION AGREEMENT PERMITS
CLASS ARBITRATION**

Recent court decisions and arbitration awards have held that broadly-termed arbitration agreements, similar to Respondents' DRA and DR Policies, that are silent regarding class arbitration, should be construed to permit class arbitration.

**A.    The Broad Language of Respondents' DRAs and DR Policies Permits Class and Collective Actions in Arbitration**

Respondents have drafted a DRA/DR policy with broad, plain language terms. The DR Policy in the Hourly Team Member Handbook states in pertinent part:

> By accepting or continuing your employment with the Company, you will be agreeing that both you and the Company will resolve by mediation and final and binding arbitration any claim that would otherwise be resolved in a court of law.  The claims governed by this agreement are those that you and the Company may have relating to your employment with, behavior during or termination from, the Company.

Respondents' Memorandum, Exhibit A, at 3-4.  The DR Policy specifically *includes* "any claims for wages compensation and benefits."  *Id.* at 6.  The DR Policy also specifically

5

*precludes* claims for workers' compensation and unemployment compensation benefits. Except for these specifically precluded claims, the language of the DR Policy objectively encompasses all other conceivable claims, including class or collective claims. *See id.; see also* Exhibit B at 3-4.

> Respondents' DRA mirrors the DR policy.  The DRA states in pertinent part:

> > By accepting or continuing employment with the Company, you agree and understand that both you and the Company mutually agree to resolve and [sic] binding arbitration any claim that, in the absence of this Agreement, would be resolved in a court of law under applicable state or federal law. The claims governed by this agreement are those that you or the Company may have relating to your employment with, behavior during or termination from, the Company.

Respondents' Memorandum, Exhibit C at 2. Like the DR policy, the DRA specifically includes "any claims for wages, compensation and benefits" and precludes claims for workers' compensation and unemployment compensation benefits. *Id.* Except for these claims which are specifically precluded, nothing in the remainder of the DRAs and DR Policies limits the breadth of the "any claim" language or otherwise suggests that particular kinds of employment claims, such as class claims, are not encompassed by the agreement. In fact, as defendants have emphasized in their brief, the DR Policies and DRAs specifically state that "any claims for wages, compensation and benefits" may be brought. *See, e.g.*, Respondents' Memorandum of Law at 5. Such types of claims are customarily brought as Rule 23 class and FLSA collective actions. Thus, the plain language of the DRAs and DR policies would lead a reasonable employee or job applicant to believe that the agreement permitted class arbitrations.

> Courts confronted with arbitration agreements that contain such broad language have consistently allowed class actions.  One notable and recent case is *The Smith & Wollensky Restaurant Group, Inc., v. Passow*, Civ. No. 10-11498-EFH, Doc. No. 17 (D.

6

Mass. Jan. 18, 2011). In that case, the language in the DRA that was subject to interpretation, "any claim that, in the absence of this Agreement, would be resolved in a court of law under applicable state and federal law" is identical/virtually identical to the language found in Respondents' DRAs and DR policies in the instant case. *Compare id.* at 2 with Respondents' Memorandum, Exhibits A-B ("any claim that, in the absence of this Agreement, would be resolved in a court of law under applicable state or federal law) and Exhibits C-D ("any claim that would otherwise be resolved in a court of law"). In *Smith & Wollensky*, the District Court held that a reasonable interpretation of the term "any claim" in an arbitration agreement included class claims. It wrote:

> The arbitrator found that the arbitration clause in the DRA was broad in its reach, covering "any claim that, in the absence of this Agreement, would be resolved in a court of law under applicable state and federal law." The arbitrator noted that "any claim" is defined as "any claims for wages, compensation and benefits" and that both the FLSA and Massachusetts wage laws statutorily authorize an individual employee to bring a class-action in a court of law. The arbitrator further found that the DRA expressly provided that the "[a]rbitrator may award any remedy and relief as a court could award on the same claim," that the applicable statutes provide for class relief and the statutes were in existence when the DRA was executed. The arbitrator also noted that "wage and hour claims like those in play here are frequently pursued as class or collective actions, and both the Claimants and S&W must be deemed to understand that."

Civ. No. 10-11498-EFH, Doc. No. 17 at 2. *See also JSC Surgutneftegaz v. Pres. & Fellows of Harvard College*, No. 04 Civ. 6069(RMB), 2007 WL 3019234 (S.D.N.Y. Oct. 11, 2007) (affirming holding that arbitration agreement permitted class arbitration based on the plain language of the agreement which broadly included "any claim, controversy, or cause of action."); *Labor Ready Northwest, Inc. v. Crawford*, Civ. No. 07-1060-HA, 2008 WL 1840749 (D. Or. Apr. 21, 2008) (in the wage-and-hour context, the ordinary meaning of an arbitration agreement's reference to "any" and "all" disputes includes class

disputes); *Ramirez v. Cintas,* No. C 04-00281-JSW, 2009 WL 921629 (N.D. Cal. Apr. 3, 2009) (the plain meaning of an arbitration agreement's broad language includes class arbitration); *Dickler v. Shearson Lehman Hutton,* 596 A.2d 860, 862-863 (Pa. Super. 1991), appeal denied 616 A.2d 984 (Pa. 1992) (arbitration agreement permits class arbitration "merely gives full weight to the language of Shearson's client agreement – *i.e.* "Any agreement").

Arbitrators have also permitted class actions where DRAs were similar to those in this case. In *Colquhoun v. Chemed Corp. and Roto-Rooter Services, Inc.,* No. 11-160-001581-10 at 14 (AAA May 6, 2011), a proceeding held in part under New York law, the arbitrator concluded that the DRA used the broadest of terms, "any and all claims, disputes or controversies, arising out of or relating in any way to my. . . . employment" and that this "would include wage-and-hour claims asserted on a class or collective basis." In *Bensen v. CSA-Credit Solutions of America,* 11-160-M-02281-08 (AAA Jul. 6, 2010), an arbitrator concluded that an arbitration agreement permitted FLSA claims to be arbitrated on a class basis. The arbitrator noted that the language of the agreement that encompassed "any dispute" was consistent with permitting class arbitration. The arbitrator also noted that at the time the agreement was signed in 2008, it was not uncommon for employers to explicitly prohibit class arbitrations and the absence of any such explicit language in the agreement supported the conclusion that it was intended to permit such proceedings. *See also DePianti v. Jan-Pro Franchising Int'l.,* Nos. 08CV10663, 111140083807, 2008 WL 6045831 (AAA Oct. 8, 2008) (broad language of agreement that covers "all disputes, controversies and claims of any kind" coupled with lack of anything to indicate a prohibition on class arbitrations would lead franchisee to believe class arbitrations were permitted).

8

It is a fundamental principle of contract law that all the terms in an agreement should be given effect. *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (1981) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."); *Wells Fargo Bank, N.A. v. ESM Fund I, LP*, 785 F. Supp. 2d 188, 196 (S.D.N.Y. 2011) (under New York law, effect and meaning must be given to every term of the contract, and reasonable effort must be made to harmonize all of its terms.). The DRAs state that the parties are to resolve in binding arbitration "any claim that, in the absence of this agreement, would be resolved in a court of law under applicable state and federal law," and the DRAs specifically include within their scope "any claim for wages, compensation or benefits." The scope of this language is sweeping. Here, the federal statutes upon which the Claimants rely for their wage claims specifically provide for collective actions – which are typically accompanied by class actions. *Shahriar v. Smith & Wollensky Restaurant Group Inc.*, Case No. 10-1884-cv (2d Cir. 2011).

Further, in interpreting the meaning of the words used in an agreement, the arbitrator should look to what a reasonable person in the position of the parties would have thought they meant. 11 WILLISTON ON CONTRACTS § 31.4 (4th Ed.). *See also John's Insulation Inc. v. Siska Construction Co., Inc.*, 671 F. Supp. 289, 293 (S.D.N.Y. 1987) ("a party's manifestations of intent are viewed from the vantage point of a reasonable man in the position of the other party."); *Howell v. Smith*, 128 S.E.2d 144, 146 (N.C. 1962) ("the test of the true interpretation of an offer or acceptance is not what the party making it thought it meant or intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."); *Miller v. Hekimian Labs., Inc.*, 257 F. Supp. 2d 506, 516 (N.D.N.Y. 2003) (the true test of what is meant is what a reasonable person in

9       .

the position of the parties would have thought the contract meant); *Tudesco v. Wilson*, 163 Pa. Super. 352, 60 A.2d 388 (1948) (the interpretation of a contract must result in a meaning that reasonably intelligent men would attach to it).

Here, the plain language of the agreement, with its reference to "any claim that would otherwise be resolved in a court of law under applicable state or federal law," objectively encompasses all conceivable claims, including wage and hour class claims, and the language "any claims for wages, compensation and benefits" specifically includes wage and hour class and collective claims. In fact, the DRA is specific regarding the two types of claims that cannot be brought in arbitration: workers compensation claims and claims for unemployment insurance. Therefore, a reasonable job applicant or employee would have understood that the DRAs and DR Policies permitted class arbitration claims, both because the agreements specifically included claims for wage compensation, and because they specifically precluded certain other claims. *See* Restatement (Second) of Contracts §203(c) ("specific terms and exact terms are given greater weight than general language"), §202(2) ("a writing is interpreted as a whole").

**B. No Language in the DRAs or DR Policies Limits Claimants to Bringing Claims Only on an Individual Basis**

Contrary to Respondents' argument, the DRAs and DR policies' use of the words "you" and "yours" does not limit the broad scope of the agreements. However, those terms cannot be read to provide any evidence of intent with respect to precluding class arbitration. In *Passow v. The Smith & Wollensky Restaurant Group, Inc.*, the arbitrator expressly rejected the argument that the word "you" means that only an individual could bring an arbitration proceeding, stating that this is a "frequently raised and constantly failed contention in challenges to class action arbitration," and that "courts

and arbitrators regularly brush aside such individuation efforts on grounds that they
unconscionably result in a waiver of class action treatment that is unenforceable." No.
11 160 00357 08 at 8 (AAA Jan. 5, 2011).

Firstly, these words can be read as either singular or plural.  For example,
Webster's New World College Dictionary defines the word "you" as:

> the person to whom one is speaking or writing: personal
> pronoun in the second person (sing. & pl.): you is the
> nominative and objective form (sing. & pl.), yours the
> possessive (sing. & pl.), and yourself (sing.) and yourselves
> (pl.) the reflexive and intensive; your is the possessive
> pronominal adjective

http://www.yourdictionary.com/you.  The use of the word "yourself" might have
provided language that would refer solely to an individual.  That word does not appear
in the agreements.  Therefore Respondents' contention that the DRAs and DR Policies
language precludes class claims, fails.

## C.   The Supreme Court Holding in *Stolt-Nielsen* Supports Permitting a Class and Collective Action in this Proceeding

Respondents' claim that the DRAs and DR Policies do not permit class
arbitration is based on a misunderstanding of the Supreme Court's decision in *Stolt-Nielsen v. AnimalFeeds International Corp.*, 130 S. Ct. 1758 (2010).  The *Stolt-Nielsen* case
arose from a dispute between two sophisticated commercial entities that entered into a
form contract used in the maritime trade, referred to as a "charter party."  *Id.* at 1764.
Unlike the wage claims at issue here, there is no custom of class actions in maritime law
and there was undisputed evidence that the charter party at issue "had 'never been the
basis of a class action.'"  *Id.* at 1769.  The arbitration clause in the charter party was
silent regarding whether class arbitration was permitted, but the parties then stipulated
that they had reached no agreement on the class arbitration issue.  *Id.* at 1765.

11

Because the parties were sophisticated business entities, neither of whom had need for the cost-sharing and retaliation protections that make class claims important – as do workers in the employment context – and because both entities were aware that class actions were unheard of in charter party disputes, the circumstances surrounding the signing of the agreement would reasonably have led the parties to assume that class arbitrations were *not* intended to be included in the agreement.  Nonetheless, AnimalFeeds filed a demand for class arbitration, which Stolt-Nielsen opposed, and the arbitration panel ruled that the arbitration could proceed on a class action basis.  *Id.* at 1765-66.  Stolt-Nielsen appealed and the case made its way to the Supreme Court.

The Court found that the arbitration panel's ruling in favor of class arbitration "was not based on a determination regarding the parties' intent."  *Id.* at 1768 n. 4.  Rather, in permitting class arbitration "the panel simply imposed its own conception of sound policy," which went beyond the authority granted to the arbitrators by the charter party.  *Id.* at 1769.  Therefore, the Court vacated the class arbitration decision and provided its own analysis as to whether the charter party permitted class arbitration. *Id.* at 1770.

The Court in *Stolt-Nielsen* noted that an interpretation of an arbitration agreement is controlled by state law and the Federal Arbitration Act and, like all contracts, "is a matter of consent, not coercion."  *Id.* at 1773.  In "construing an arbitration clause, courts and arbitrators must give effect to the contractual rights and expectations of the parties," and may not compel a party "to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so."  *Id.* at 1773-75.  Normally, in the absence of an explicit statement in an agreement regarding class arbitration, the next step would be to examine the arbitration provision as a whole to determine whether, properly construed, it evidenced such an agreement.  However,

the Court had "no occasion to decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration," *id.* at 1776 n. 10, because of the parties' stipulation that "no agreement ha[d] been reached on that issue." *Id.* at 1766. Given that stipulation, there was nothing to interpret. In the stipulated absence of an agreement to permit class arbitration, the FAA precluded the arbitration panel from imposing class arbitration. *Id.* at 1776.

While *Stolt-Nielsen* holds that silence in an arbitration agreement is insufficient, standing alone, to confer consent to class arbitration, it does *not* stand for the opposite position that silence in an arbitration agreement precludes a finding of consent to arbitrate class claims. Contrary to Respondents' assertions, the Second Circuit in *Jock v. Sterling Jewelers Inc.*, found that "*Stolt-Nielsen* does not foreclose the possibility that parties may reach an 'implicit' – rather than express – 'agreement to authorize class-action arbitration.'" 646 F.3d 113, 123 (2d Cir. N.Y. 2011) (internal citations omitted). This reading of *Stolt-Nielsen*, that silence does not preclude a finding of consent, is consistent with the basic tenet of contract law that consent does not need to be express. *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 4 ("A promise may be stated in words either oral or written, or may be inferred wholly or partly from conduct."). Thus, the question of consent must be addressed by referring to the language of the arbitration agreement and to underlying law. Courts and arbitrators confronted with agreements that are silent with respect to class arbitration have interpreted those agreements as permitting class arbitration, based in part on their analysis of *Stolt-Nielsen*.

In *The Smith & Wollensky Restaurant Group, Inc. v. Passow*, the court upheld an arbitrator's interpretation of a silent arbitration agreement to permit class arbitration:

> S&W contends that *Stolt-Nielsen* prevents the claim from proceeding in arbitration. The Court disagrees. In *Stolt-Nielsen*, "the parties stipulated that there was 'no agreement'

> on the issue of class-action arbitration." Here, there was no such stipulation and, thus, the arbitrator was authorized "to decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration."

Civ. No. 10-11498-EFH, Doc. No. 17 at 2 (internal citations omitted).

Similarly, the court in *Galakhova v. Hooters of America, Inc.*, found that *Stolt-Neilsen* supported a finding that a silent arbitration agreement provides for class treatment:

> Unlike the parties in *Stolt-Nielsen*, the parties here did not stipulate that there was "no agreement" between them "on the issue of class-arbitration." Thus, this court, unlike the Court in *Stolt-Nielsen*, has "occasion to decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration. The arbitration agreement here supports such a finding. The agreement provides that "all Claims" shall be arbitrated, including, but "not limited to, any claim whether arising under federal, state, or local law.". . . A class-action claim, of course, would be such a claim, as would a wage claim, which, as is the case with a class-action claim, is not specifically mentioned in the agreement.

*Galakhova*, 34-2010-00073111-CU-OE-GDS at 2 (Cal. Sup. Ct., Sacramento County, Jul. 27, 2010) (internal citations omitted).

In *Colquhoun v. Chemed Corp. and Roto-Rooter Services, Corp.*, Arbitrator Ruth D. Raisfeld found that *Stolt-Nielsen* does not require an explicit or express agreement regarding class arbitration. Arbitrator Raisfeld stated:

> The DRA uses the broadest of terms to explain to the employee signatories just what the Respondents meant by "any and all claims, disputes or controversies . . . arising out of or relating in any way to . . . my employment. . . . . This language is a clear and objective expression of Respondents' intent to capture within the scope of the arbitration clause the entire body of statutory and common law claims to be available to employees in arbitration. Given this expansive language describing the scope of the parties' duty to arbitrate, the DRA must have been intended to cover FLSA collective actions which are expressly authorized by federal statute, 29 U.S.C. § 216(b), and class actions which are

> expressly authorized by Rule 23 of the Federal Rules of Civil
> Procedure, a common procedural vehicle for enforcing state
> wage-and-hour laws.
>
> ****
>
> Therefore, it is reasonable to conclude that the drafter of the
> DRA intended to require its employee signatories to
> arbitrate all disputes regarding employment, of every kind
> whatsoever, including collective and class arbitration of
> wage-and-hour claims.

*Colquhoun*, No. 11-160-001581-10 at 14-15 (AAA May 6, 2011).

In *Demetriou v. Earthlink, Inc.*, Arbitrator Brendan M. Hare analyzed *Stolt-Nielsen* and found it important that:

> [T]he Supreme Court did not (1) mandate an express consent to class
> arbitration; (2) state that it would never be reasonable to supply a contract
> term permitting class arbitration; or (3) consider the propriety of
> supplying such a term in the context of small value consumer claims
> arising from a contract of adhesion arising under the laws of any specific
> state.

No. 11-117-00273-10 at 9 (AAA Sept. 1, 2010). Rather, Arbitrator Hare noted that the Supreme Court's "conclusion related to the circumstances of sophisticated business entities where the complaining party chose the form contract, where there was no evidence of a federal maritime rule of custom and usage, and where there was evidence negating the use of the class device in such shipping contracts."[2] *Id. See also* 2011 AAA Employment LEXIS 161 at *6 ("[u]nder *Stolt*, an express agreement is not mandated. The test is whether there is a 'contractual basis' for class arbitration.").

*Stolt-Nielsen* has two important holdings. First, the question of whether an arbitration agreement permits class arbitration must be decided based on the intent of the parties. Second, the fact that an agreement does not explicitly reference class arbitration does not decide the issue unless, as in *Stolt-Nielsen*, the parties stipulate that

---

[2] Compare the "sophisticated business entities" who were parties to the arbitration agreement in *Stolt-Nielsen*, to Claimants in this case.

there was no agreement on class arbitration.  Absent such a stipulation, the ordinary rules of contract interpretation must be applied to discern whether an agreement, properly construed, reflects an intent to permit class arbitration.

**POINT II**

**PRINCIPLES OF CONTRACT INTERPRETATION
SUPPORT PERMITTING CLASS ARBITRATION**

Respondents' DRAs and DR policies do not explicitly discuss class actions. However, principles of contract interpretation support the finding that these agreements permit class arbitrations.

**A.    The Expectation of the Parties**

In "construing an arbitration clause, courts and arbitrators must give effect to the contractual rights and expectations of the parties." *Stolt-Nielsen* at 1773-74.  It is a fundamental principle that "a contract includes not only the promises that are set forth in express words, but also any implied provisions that are necessary to effectuate the intention of the parties, and that arise from the express language of the contract and from the circumstances under which it was made." 11 WILLISTON ON CONTRACTS, § 31.4 (4th Ed.).  Such "[i]mplied terms of a contract are just as much a part of the contract as express ones." *Id.* at §31.7.  In considering what terms are implied in an agreement, the rule of reasonable expectations applies.  This rule holds that a party choosing particular language in an agreement will be bound by the meaning that he could reasonably expect the other party to place on that language. *Id. at* § 31.11; *see also Rowe v. Great Atlantic & Pacific Tea Co., Inc.*, 46 N.Y.2d 62, 68 (1978) ("the undertaking of each promisor in a contract must include any promises which a reasonable person in the position of the promisee would be justified in understanding were included."); RESTATEMENT (SECOND) OF CONTRACTS § 201(2) ("[w]here the parties have attached

16

different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made (a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or (b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.").

Because Respondents drafted the DRAs and DR Policies, these agreements must be interpreted from the point of view of a reasonable employee or new hire entering into the agreement. In this case, both the express language of the agreements and the circumstances under which they were made support the conclusion that a reasonable person employed or accepting employment with Café Centro would have understood the DRA and DR Policies to permit class arbitrations.

The circumstances surrounding the signing of the DRAs also lead to the conclusion that the agreement included class actions. It is black letter law that "a contract should be interpreted in light of the circumstances and the facts known to the parties at the time they entered into the agreement." 11 WILLISTON ON CONTRACTS § 32.7 (4th Ed.); RESTATEMENT (SECOND) OF CONTRACTS § 202, comment b. One such circumstance known to the Respondents when they drafted the agreement was that employment claims are typically litigated as class actions. Since the adoption of Federal Rule 23 in 1966, the benefits of class actions in the employment context, such as making the prosecution of small claims possible and protecting workers from retaliation who are reluctant to bring claims as individuals, have been well known. Thus, in the absence of anything in the agreements qualifying the broad sweep of the "any claims" language, Respondents knew or should have known that employees and prospective employees presented with the DRAs and DR policies would read their language to be

consistent with the common practice of bringing employment claims as class claims.[3] *See Smith & Wollensky Restaurant*, Civ. No. 10-11498-EFH, Doc. No. 17 (D. Mass. Jan. 18, 2011) ("wage and hour claims like those in play here are frequently pursued as class or collective actions, and both the Claimants and S&W must be deemed to understand that."); *Colquhoun*, No 11-160-001581-10 at 18 (it is reasonable to assume that when Roto-Rooter promulgated the DRA, it was "aware of the laws applicable to arbitration of employment disputes and the availability of class action arbitration.").

**B.    The Reasonable Interpretation of the Contract**

A second principle regarding contracts is that an interpretation that makes a contract reasonable by not giving one party an unreasonable advantage over the other is preferred to one that yields unreasonable results. 11 WILLISTON ON CONTRACTS § 32.11 (4th Ed.). This principle is based on the probability that the parties would more likely have entered into a fair contract than one with overreaching provisions. *Id.* In an employment case, the right to proceed on a class action basis is extremely important to workers, because it allows them to share costs, obtain counsel, and avoid retaliation. The waiver of such a right places workers at a distinct disadvantage to their employers. *See Gentry v. Superior Court*, 42 Cal. 4th 443, 457-462 (2007). Thus, it is far more reasonable to interpret the DRAs and DR Policies as permitting class arbitrations than to interpret them as implicitly prohibiting them.

---

[3] Contrary to Respondents' assertions, Claimants do not argue that silence regarding class arbitration creates ambiguity in the agreements. Rather, Claimants state that provisions such as "any claims" clearly include class claims. However, if these provisions are in any way ambiguous, then the parties' intent should be construed and that intent may be proven by extrinsic evidence, including evidence of surrounding facts and circumstances. *67 Wall Street Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 248 (1975).

C.   **Respondents' Contract of Adhesion Supports a Finding that Respondents Consented to Class Arbitration**

A third principle of contract interpretation is that "[i]n choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds." RESTATEMENT (SECOND) OF CONTRACTS § 206. *See also* WILLISTON ON CONTRACTS § 31.11 ("[t]he law will presume that the defendant meant what his language by its terms and under the circumstances in which it was used would fairly be understood to mean, and this presumption is a matter of law and not to be rebutted by proof that he intended something more or different which he made no attempt to express and which the plaintiff neither understood nor had reason to understand."); *U.S. v. Stuart*, 489 US 353, 367 n. 7 (1989) ("[i]t is hornbook contract law that the proper construction of an agreement" is that given by one of the parties when "that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party."); *Boosey & Hawkes Music Publishers v. Walt Disney Co.*, 145 F.3d 481, 487 (2d Cir. 1998) ("[i]f the contract is more reasonably read to convey one meaning, the party benefitted by that reading should be able to rely on it; the party seeking exception or deviation from the meaning reasonably conveyed by the words of the contract should bear the burden of negotiating for language that would express the limitation or deviation."). Likewise, this fundamental contract principle guides courts that regularly construe any ambiguities against the drafter of the document. *See Slatt v. Slatt*, 102 A.D.2d 475, 476-477 (N.Y. App. Div. 1984); *see also* WILLISTON ON CONTRACTS § 32.12.

Respondents drafted the DRAs and forced them upon Claimants as a condition of employment, thereby creating contracts of adhesion. The only option Café Centro

presented to its workers was to accept the agreements or risk not working at Café Centro. Accordingly, if Respondents intended to exclude class claims, they had an obligation to say so. [4] As Justice Ginsberg noted in her dissent of *Stolt-Nielsen*, the majority decision did not extend to "contracts of adhesion presented on a take it or leave it basis." *Id.* at 183 (Ginsberg, J. dissenting). In *Saincome v. Truly Nolen of Am., Inc.*, the court analyzed an employer's arbitration agreement, which was silent regarding class arbitration, and found it to be a contract of adhesion presented on a take-it-or leave-it basis. 2011 U.S. Dist. LEXIS 85880, at *32-33 (S.D. Cal. Aug. 3, 2011). Adhering to Justice Ginsberg's cautionary remark, the court found that the *Stolt-Nielsen* holding – that parties may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so – was inapplicable in reference to employer's arbitration agreement. *Id.*

Therefore, when choosing reasonable interpretations of the DRA it is appropriate to construe any ambiguity against Respondents. As a result, not only does the plain language of the DRAs and DR Policies indicate that Respondents consented to class arbitration, but also that Respondents actually choose the very language which they now seek to avoid.

**D. Policy Considerations Further Support a Finding that Respondents Consented to Class Arbitration**

A fourth principle in contract law is that "[i]n choosing among the reasonable meanings of a promise or agreement or at term thereof, a meaning that serves the public interest is generally preferred." RESTATEMENT (SECOND) OF CONTRACTS § 207. *See also*

---

[4] *See Bazzle v. Green Tree Fin. Corp*, 569 S.E.2d 349, 460 (S.C. 2002) ("[i]f we enforced a mandatory, adhesive arbitration clause, but prohibited class actions in arbitration where the agreement is silent, the drafting party could effectively prevent class actions against it without having to say it was doing so in the agreement.").

WILLISTON ON CONTRACTS §§ 32.18, 32.19 (4th Ed.) (where private contracts touch on the public interest, an interpretation that carries out that public interest is preferred to one that defeats that interest). *Stolt Nielsen* does not preclude arbitrators from considering established public policies when determining the reasonable interpretation of an agreement. In fact, the Court emphasized that arbitrators should look to governing law when determining how to interpret "a 'silent' contract." *Id.* at 1768. In this proceeding, the established policy should be considered under the FLSA as well as the governing rules of Federal Rule 23 and Article 9 of the New York Civil Practice Law and Rules, which set forth the benefits of classing of claims. *See* 29 U.S.C. § 202; *see also* N.Y.C.P.L.R. 9 (McKinney 2006).

There is a strong public interest in enforcing labor laws. The FLSA and the NYLL are designed not only to protect individual workers, but also competing employers and the public at large.[5] Class actions are critical to enforcing those statutes and carrying out the public interest. That is why the FLSA specifically allows for class litigation. 29 U.S.C. § 216(b). *See Colquhoun*, No 11-160-001581-10 at 19 (finding that if arbitration were limited to individual actions, the arbitrator would have to ignore the conventional reading of the broad language of the DRA – with its incorporation of all federal and state statutory claims – and imply an exception for the clause in the FLSA that provides for an action by "one or more employees for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). Thus, an interpretation permitting class arbitration facilitates public policy. In contrast, denying class arbitration will deprive the overwhelming majority of Café Centro workers from obtaining the backpay and damages they are entitled to under the FLSA and NYLL.

---

[5] *See, e.g.* 29 U.S.C. § 202 (finding that unfair labor practices spread ill health, burden commerce, lead to labor strife, and interfere with the fair marketing of goods).

E.    **Contracts Should Be Interpreted to be Lawful to the Extent Possible**

A fifth contract law principle is that contracts should be interpreted to be lawful,

to the extent possible, rather than unlawful. 11 WILLISTON ON CONTRACTS § 32.11 (4th

Ed.).  Reading the DRA and DR policy to prohibit class actions would violate the

National Labor Relations Act ("NLRA").  Section 7 of the NLRA guarantees that

"[e]mployees shall have the right to . . . engage in other concerted activities for the

purpose of . . . mutual aid or protection . . .."  29 U.S.C. §§ 157-158.  It is unlawful under

Section 8(a)(1) of the NLRA for employers "to interfere with, restrain, or coerce

employees in the exercise of" those rights.

It is well settled that protected concerted activity includes the filing of collective

and class action lawsuits regarding employment matters.  *See Saigon Gourmet*, 353 NLRB

No. 110 (2009) (employer violated the NLRA when it promised to raise delivery

workers' wages if they abandoned their plan to file a wage-and-hour lawsuit and by

discharging employees who "were preparing to file a wage-and-hour lawsuit, [which

is] clearly protected activity. . . ."); *In re 127 Restaurant Corp. D/B/A/ Le Madri Restaurant*,

331 NLRB 269, 275-75 (2000) (employer unlawfully discharged two employees for

engaging in protected activity including filing a lawsuit on behalf of themselves and 17

other employees alleging violations of federal and state labor laws); *52nd Street Hotel

Assocs. D/B/A Novotel New York*, 321 NLRB 624, 633-636 (1996) (filing of an "opt-in" class

action lawsuit alleging employer violations of the FLSA was protected concerted

activity); *Trinity Trucking & Materials Corp.*, 221 NLRB 364, 365 (1975) *enfd. mem.* 567 F.2d

391 (7th Cir. 1977) *cert. denied* 438 U.S. 914 (1978) (filing of a lawsuit by a group of

employees alleging that their employer had failed to pay them contract scale was

deemed protected activity).  *See also U-Haul Co. of Ca., Inc.*, 347 NLRB 375, 377-378 (2006)

*enfd.* 255 Fed. Appx. 527 (D.C. Cir. 2007) (enforced a Board order prohibiting an

employer from using a mandatory arbitration agreement that could reasonably be read to prohibit an employee from filing unfair labor practice charges with the Board).

Because employees have a right to act in concert to enforce their statutory employment rights before courts and other administrative tribunals, any attempt by an employer to condition employment on an employee's waiving his or her right to engage in concerted legal activity, including filing class actions, violates the NLRA. Reading the DRAs and DR Policies to permit class arbitration avoids this illegality and is, therefore, the preferred interpretation.

In sum, numerous fundamental principles of contract interpretation that address the expectations of the parties, the reasonableness of the contract, the inequality of contracts of adhesion, and that contracts should be construed be in accordance with law and public policy, compel the conclusion that Respondents' DRA and DR Policies permit class arbitrations.

**POINT III**

**IF THERE WAS NO AGREEMENT REGARDING
CLASS ARBITRATIONS, THEN THERE IS NO
AGREEMENT TO ARBITRATE**

Claimants reasonably understood the DRA and DR Policies to permit class arbitrations. Because Respondents drafted these contracts of adhesion, Claimants' reasonable understanding should control.[6] But if the Arbitrator rejects this conclusion and finds that Respondents are not bound by the Claimants' reasonable understanding, then there has been no meeting of the minds because Claimants reasonably thought that they were agreeing to an arbitration that allowed for class arbitration and – if the Arbitrator so finds – Respondents did not intend class arbitrations to be part of the

---

[6] *See* Popovich Decl. at ¶ 23; Hewetson Decl. at ¶ 13 (showing that Claimants had no knowledge of an alleged class action waiver).

agreement. In such circumstances, there is no enforceable agreement. *See* RESTATEMENT (SECOND) OF CONTRACTS § 201(3) ("[e]xcept as stated in this Section, neither party is bound by the meaning attached by the other, even though the result may be a failure of mutual assent."). Just as Stolt-Nielsen could not be compelled to participate in a class arbitration that the parties stipulated it had not agreed to, Claimants cannot be required to participate in "individual claims only" arbitration, to which they did not agree.[7]

## POINT IV

### A CLASS ARBITRATION WAIVER
### WOULD BE UNENFORCEABLE

In the unlikely event the DRAs and DR Policies are construed to mean that class arbitrations are prohibited, then the contracts are unconscionable and unenforceable. The Federal Arbitration Act ("FAA") provides that, when grounds "exist at law or in equity for the revocation of any contract," courts may decline to enforce such agreements. 9 U.S.C. § 2; *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 683 (1996). "Generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening [FAA] § 2." *Kristian v. Comcast Corp.*, 446 F.3d 25, 63 (1st Cir. 2006). If the DRAs and DR Policies were read to prohibit class arbitration, the agreements would be unenforceable because (1) Claimants did not receive adequate notice that they were waiving their right to proceed as a class, and (2) such a prohibition would prevent Claimants from vindicating their statutory rights, in violation of the FAA.

---

[7] Respondents' argument that those Claimants who were non-signatories to a DRA assented to a purported class action waiver in the DR Policies is even more tenuous as it is unclear as to whether the Claimants assented to the DR Policies at all.

A.    **Lack of Adequate Notice**

Should the DRAs be interpreted to contain an implicit waiver of the right to

proceed on a class basis, they would be unenforceable because Claimants did not

receive adequate notice of such a waiver. *See* Popovich Decl. at ¶ 23; Hewetson Decl. at

¶ 13. An employee's ability to seek redress on a class basis is a valuable right that the

FLSA and state labor laws specifically recognize. *See Barrentine v. Arkansas-Best Freight*

*Sys.*, 450 U.S. 728, 740 (U.S. 1981) ("we have held that FLSA rights cannot be abridged

by contract or otherwise waived because this would "nullify the purposes" of the

statute and thwart the legislative policies it was designed to effectuate"); *Gilmer v.*

*Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (U.S. 1991) (by agreeing to arbitrate a

statutory claim, a party does not forgo the substantive rights afforded by the statute; it

only submits to their resolution in an arbitral, rather than a judicial, forum.). It remains

the law of the Second Circuit that an arbitration provision which "precludes plaintiffs

from enforcing their statutory rights" is unenforceable. *Nat'l Supermarkets Assoc. v. Am.*

*Express Travel Related Servs. Co. (In re Am. Express Merchants' Litig.)*, 634 F.3d 187, 199 (2d

Cir. 2011) (finding class action waiver unenforceable in consumer context where size of

any potential recovery by an individual plaintiff would be too small to justify expense

of bringing an individual action).

In fact, legislation permitting class actions arises from the recognition that class

actions may be a more effective method for redressing small claims. *See Deposit Guar.*

*Nat'l Bank v. Roper*, 445 U.S. 326, 338 (1980) (noting that "the class action . . . may

motivate [plaintiffs] to bring cases that for economic reasons might not be brought

otherwise"); *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (stating that  class

action solves the incentive problem created by small damages "by aggregating the

relatively paltry potential recoveries into something worth someone's (usually an

attorney's) labor."). Class actions are particularly important in the labor context because they provide workers some protection from retaliation. *Gentry v. Superior Court*, 42 Cal. 4th 443, 459-460 (2007) (citing fear of retaliation as a basis for striking down a class-action waiver in the wage-and-hour context). Assuming that such rights can be waived, there must be fair notice to an employee for such a waiver to be valid.

Lack of fair notice renders arbitration agreements generally, and class action waivers in particular, invalid and unenforceable. For example, in *Shirchack v. Dynamics Research*, 508 F.3d 49 (1st Cir. 2007), an employer sent e-mails to its employees notifying them of an "improved" dispute resolution program which would be deemed accepted if an employee came to work the following Monday. Buried in the appendix to one of five attachments to the e-mail was a provision adding a class action waiver to the previously signed arbitration agreement. The First Circuit held that this method of notifying employees of the waiver did not provide fair notice and found the waiver to be unenforceable. *Id.* at 59-60. *See also AT&T Mobility LLC v. Concepcion*, No. 09-893, 12 n6 (April 27, 2011) (states "remain free" to require "class action waiver provisions in adhesive arbitration agreements to be highlighted."); *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 668 (6th Cir.2003) (*en banc*) (agreement to arbitrate must be knowing and voluntary); *Hopkins v. New Day Financial*, 643 F. Supp. 2d 704, 719 (E.D. Pa. 2009) (class-action waiver given to employees on take-it-or-leave-it basis would be unconscionable if jury finds that employees did not have adequate time to understand the waiver); *Quiles v. Financial Exchange Co.*, 879 A.2d 281, 286 (Pa. Super. 2005) (where exact terms of arbitration agreement were never communicated to employee there was no knowing and voluntary waiver of rights and agreement was unenforceable); *Liodori v. CIGNA Corp.*, 175 N.J. 76, 96 (2002) ("[A] waiver-of-rights provision must reflect that an employee has agreed clearly and unambiguously to arbitrate the disputed claim.");

*Geiger v. Ryan's Family Steak Houses, Inc.,* 134 F.Supp.2d 985, 997 (S.D.Ind. 2001) (Indiana law places on the party seeking to enforce an arbitration contract the burden of showing that the contractual provisions were explained to the other party and came to his knowledge and there was in fact a real and voluntary meeting of the minds).

In this case, the notice of the alleged class waiver provided to Claimants was even less fair than that in *Shirchnck* and *Hopkins.* In the first place, not all Claimants were signatories to the DRAs; Respondents have simply deemed that they accepted the DR Policies simply by continuing their employment. As Respondents state, these Claimants merely attended meetings where the handbook, which contained the DR Policy, was distributed. Specht Decl. ¶ 11; Olivieri Decl. ¶ 7. [8] Respondents now deem these Claimants (as well as those who were signatories to the DRA), to have accepted a waiver, which, if it even existed would be only *implicit.* Nothing on the face of the DRAs or DR Policies alerted Claimants to the fact that they allegedly contained a class waiver and, as explained above, the language of these agreements could reasonably be understood to permit class arbitration. Café Centro did nothing to explain the class waiver it now alleges was contained in the agreement. In the case of new hires, the agreement was simply handed to them along with a stack of other papers that they had to sign before beginning work. *See* Popovich Decl. at ¶¶ 5-6; Hewetson Decl. at ¶¶ 4-6. In the case of workers who were given revised handbooks, notice of any alleged waiver was even more attenuated. In these circumstances, it cannot be said that Claimants received any notice, let alone fair notice, of the alleged class waiver. Nor can it be said that they clearly and unambiguously waived their right to proceed on a class basis. Accordingly, the alleged class waiver is unenforceable.

---

[8] Absent from these declarations are any indicia that the arbitration policy, or even the handbook itself, was discussed with Café Centro staff.

**B.**    **Respondent's DRAs and DR Policies Should be Interpreted to Accomplish Their Fundamental Purpose of Using Arbitration to Resolve All Disputes With Employees**

A rule of contract interpretation is that "a contract should be interpreted to accomplish its purpose." RESTATEMENT (SECOND) OF CONTRACTS § 202 and comment c; 11 WILLISTON ON CONTRACTS § 32.9 (4th Ed.). This principle compels the conclusion that the only reasonable interpretation of the DRAs and DR Policies is that they were intended to permit class arbitration. The primary purpose of these documents was to ensure that employment disputes be resolved through arbitration rather than through judicial processes. As stated above, class action waivers in employment contracts are unlawful where, as here, the alleged waiver is not explicit. Because a waiver without proper notice would produce an unlawful result, reading the agreements as permitting class arbitration is consistent with their purpose – to ensure arbitration of disputes – whereas reading the agreements as prohibiting class arbitration is not. The logical conclusion is that Respondents must have intended the agreements to permit class arbitration since that would be the only way they could accomplish their intended purpose.[9] To read the agreements as implicitly barring class arbitrations or as not addressing the class issue at all would render the agreements invalid, thereby making them incapable of achieving their primary purpose. It would be directly contrary to the basic rules of contract interpretation to read an agreement in such a way as to defeat the primary purpose for which it was drafted.

---

[9] Moreover, at the time the DRA was drafted, there were various courts which found that arbitration agreements with class action waivers interfere with the ability to vindicate important statutory rights. *See e.g. Kristian v. Comcast Corp.*, 446 F.3d 25, 63 (1st Cir. 2006). Respondents are savvy businesses that must have been aware of these decisions at the time they presented workers with the DRA.

## CONCLUSION

For all of the foregoing reasons, the arbitration should be permitted to proceed as a collective and class arbitration and all of the employees of Café Centro who were illegally deprived of their lawful compensation should be entitled to recover their lost wages and damages.

Dated:  November 18, 2011

BERKE-WEISS & PECHMAN LLP

By:
Louis Pechman
Jessica Tischler
N. Marely Mercado
Carol Richman, *Of Counsel*
488 Madison Avenue, 11th Floor
New York, New York 10022
(212) 583-9500
*Attorneys for Claimants*